# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Norfolk Division

RHONDA E. C.,[1]

                    Plaintiff,

v.                                       ACTION NO. 2:21cv94

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Rhonda C. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 14. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 16) be **GRANTED**, the Commissioner's motion for summary judgment (ECF No. 21) be **DENIED**, and the case be **REMANDED** to the Commissioner for further proceedings..

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.       PROCEDURAL BACKGROUND

Rhonda C. ("plaintiff") protectively filed applications for benefits on June 17, 2019, alleging she became disabled on June 1, 2019, due to multiple physical and mental impairments.[2] R. 17, 19–20, 86–87, 90, 235–39, 309.  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 75–96, 101–26.  ALJ William Pflugrath held a remote hearing on August 14, 2020, and issued a decision denying benefits on August 25, 2020.  R. 14–31, 38–69.  On December 9, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 3–7. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on February 12, 2021.  ECF No. 1.  The Commissioner answered on June 21, 2021.  ECF No. 12.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on August 5, 2021, and October 5, 2021, respectively.  ECF Nos. 16–17, 21–22.  Plaintiff filed a reply on November 10, 2021.  ECF No. 27.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

## II.      RELEVANT FACTUAL BACKGROUND

Plaintiff's presents two issues on appeal.  First, she argues that the ALJ erred in classifying the medical opinions of her treating cardiologist and physician's assistant as not persuasive by failing to properly consider whether they were supported by and consistent with the record. Second, she contends that the status of the ALJ and Appeals Council who considered her claim

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

was constitutionally defective and requires a remand.  The Court's review of the facts below is tailored to such arguments.

**A.**   ***Background Information and Hearing Testimony by Plaintiff***

At a hearing before the ALJ on August 14, 2020, plaintiff provided the following information.  At that time, the 51-year old plaintiff lived in a first-floor apartment with her boyfriend. R. 38, 45.  Plaintiff most recently worked as a cashier/stocker at a convenience store and, before that, as a stocker and then a cashier at a large retail store. R. 42–43, 46–48; *see* R. 310 (noting high school education).  Plaintiff stopped working in June 2019, shortly after a robbery occurred at the store while she worked. R. 48–49.  At that time, and due to a recent cardiac catheterization, plaintiff decided that her health status precluded further work. R. 49–50.

In October 2019, plaintiff had an arterial stent placed in a blood vessel leading to her heart. R. 50.  Initially, plaintiff testified that her condition failed to improve and reported continuing fatigue and shortness of breath. *Id.*  When the ALJ directed her to a November 20, 2019 record noting significant improvement, mostly resolved chest pains, only fleeting, modest chest discomfort, and a desire to continue with existing medications and rehabilitation, plaintiff agreed she "had some improvement" and was "doing pretty well." R. 51.  She added, however, that her "spells . . . come and they go" without warning, and when she feels poorly she goes back to the doctor. *Id.*  Plaintiff needs an additional arterial stent due to a blockage, but was told that it could not be done due to the poor condition of her heart. R. 50–51.  Although unable to do as much as she desires, plaintiff compensates by trying not "to overdo it" and by watching her weight. R. 51–52; *see* R. 59 (reporting "very eas[ily] . . . get[ting] out of breath" and an inability to do much without help).

3

With respect to her eyesight and diabetic retinopathy, plaintiff is unable to see "anything in the right eye" and uses unprescribed readers or a magnifying glass to read out of her left eye. R. 52–53. Although she reads infrequently and relies on her boyfriend to help with that, plaintiff takes trips to the library to read and "just [to] get out of the house." R. 53; *see also* R. 57–58.

As for other impacts of diabetes, plaintiff lost one of her bottom teeth due to a combination of diabetes and chemotherapy stemming from an earlier, successful fight against cancer. R. 54. She also has foot problems, including neuropathy in her toes and feet, and ingrown toenails, and seeks treatment with a foot doctor, when able to afford it. R. 55, 57. Plaintiff uses both a walker and cane, although neither has been prescribed by a doctor. R. 55–56. Because she cannot walk far without feeling exhausted, plaintiff takes a walker to help with balance and so that she can stop, sit, and rest. *Id.* Plaintiff regularly uses a cane or walking stick to minimize the risk of trips and falls due to poor eyesight and balance problems. R. 56–57 (noting she tripped and fell while walking without a cane).

Plaintiff also suffers from anxiety and depression. R. 58. Plaintiff fears dying like her father, who similarly had a serious heart condition and died of a "massive heart attack." R. 58, 60. Due to this and her heart specialist's statement that "[t]here is not a whole lot more they can do other than try to keep it open," plaintiff is anxious and depressed and fears she will die young. R. 59–61.

In terms of functional abilities, plaintiff drives occasionally when needing to "get my family help" and sometimes uses the bus. R. 45, 55. With her boyfriend's help, she occasionally cooks. R. 59. She is able to stand for 15 to 20 minutes, after which her feet, heart, and chest start to "burn" and her eyes "feel . . . very heavy." R. 61. She is able to lift approximately 10 pounds. R. 61–62.

Plaintiff's November 10, 2019 function report contains similar information.[3]   R. 364–71. It lists daily activities as going to appointments, taking short walks, watching television, listening to music, taking medications, reading, and doing limited household chores.  R. 364, 368.  Plaintiff uses public transportation to shop about once a week and engages in social activities, including going to the library and church, only two to three times per month.  R. 367–68.  Before her conditions worsened, plaintiff could lift more, walk long distances, drive at night, and stand for more than five minutes.  R. 365.

Although able to engage in personal care, such as dressing, bathing, feeding, etc., plaintiff needs help with reading medications and mail, navigating the shower, and dressing, due to problems with her hands and eyesight.  R. 364–65.  Plaintiff fixes simple meals and salads on a daily basis, but takes longer to do so due to "low energy" and difficulty using her hands.  R. 366. Likewise, plaintiff takes "most of the day" to complete light housework, including dusting, dishes, and laundry.  *Id.*  Finally, she reported that her poor health impacts her ability to lift, walk, climb stairs, squat, see, bend, kneel, reach, stand, talk, use her hands, complete tasks, get along with others, and concentrate.   R. 369; *but see* R. 369–70 (noting her ability to follow written instructions, finish what she starts, and get along with authority figures).  Plaintiff attributes these diminished abilities to chest pain caused by walking a few feet, shortness of breath, fatigue and depression, and restrictions on lifting items weighing 10 pounds or more.  R. 369.

---

[3] Plaintiff similarly recounted daily activities at a consultative mental health examination. *See* R. 824–25.  During the exam, plaintiff reported that her roommate carries her laundry basket due to heart disease, that she is able to drive, manage money, and take public transportation. R. 824.  She also stated a typical day involves showering, getting dressed, watching TV, taking the bus to and walking around the library, returning home, sitting outside, and sleeping when tired. R. 825.

**B.      *Hearing Testimony by Vocational Expert***

Linda Augins, a vocational expert ("VE"), also testified at the hearing.  R. 39, 62–68.
Based on the ALJ's hypotheticals, VE Augins opined that past relevant work could not be
performed.  R. 65–66.  VE Augins testified that certain unskilled, light jobs in the national
economy, such as office helper, linen sorter, and laundry folder, could be performed by one with
plaintiff's age, education, work history, and residual functional capacity ("RFC").  R. 63–66.

**C.      *Relevant Medical Record***

Plaintiff mostly received medical treatment from several providers associated with Sentara
Health.  For her heart condition, plaintiff received treatment from Sentara Cardiology Specialists
("SCS") and at Sentara hospitals and clinics.  *See, e.g.,* R. 399.  At SCS, plaintiff received treatment
from treating cardiologist, Ronald A. Stine, M.D., his partner, and several physician assistants,
among others.  *See, e.g.,* R. 399, 411, 419–20, 695–96, 714.  Plaintiff also received treatment from
the Sentara Ambulatory Care Center ("SACC"), *see, e.g.,* R. 488, and then later from Sentara
Internal Medicine Physicians, for diabetes and other, general health issues, *see, e.g.,* R. 717–22.
For vision problems and diabetic retinopathy, plaintiff received treatment at the Eastern Virginia
Medical School ("EVMS"), Department of Ophthalmology.  *See, e.g.,* R. 527.  Finally, she also
received foot care from Dr. Arteen Rassool.  R. 844–45.

**1.      *Treatment with Sentara Cardiology Specialists***

Plaintiff underwent a left heart catheterization on April 19, 2018, which revealed an
"occluded prox[imal] [lower anterior descending coronary artery]."  R. 522 (noting chronic
shortness of breath upon exertion that had gradually worsened over last half year).   After this
procedure, Dr. Stine requested that George M. Dimeling, IV, M.D., a cardiothoracic surgeon
evaluate plaintiff for open heart surgery.  R. 426.  In April 2018, Dr. Dimeling assessed plaintiff

to be a poor candidate for coronary artery bypass surgery due, among other reasons, to her poor health and recommended pursuing other treatment options first. *Id.* (describing plaintiff as "a brittle diabetic with age much older than stated with extremely late back filling of [the lower anterior descending coronary artery] and no indication that the surgical target will be amenable to bypass").

On June 21, 2018, Dr. Stine performed a cardiac catherization on plaintiff. R. 608–14. During this procedure, Dr. Stine successfully placed an intracoronary, drug-eluting stent to treat her coronary artery disease and exertional angina and plaintiff was discharged from the hospital the next day. R. 522–23, 608–14. Dr. Stine's discharge summary included a diagnosis of coronary artery disease with exertional shortness of breath. R. 522

At an August 8, 2018 appointment at SCS, plaintiff reported feeling "well from a heart standpoint" and noticing "a very slight improvement in her shortness of breath." R. 495–96 (noting denial of chest pain, pressure, palpitations, syncope, etc. An examination reported cardiovascular findings of a "regular rate and rhythm," without any "murmur, rub or gallop," and "trace lower extremity edema" (greater on the left than the right). R. 497. A physician's assistant continued plaintiff on aspirin, Plavix, Coreg, and lisinopril, and directed resumption of Lipitor (if able to afford) for hyperlipidemia and follow-up in six months. R. 496.

At a February 13, 2019 follow-up visit to SCS, plaintiff complained of increasing shortness of breath and weight gain, and admitted to "excessive salt intake" and "unhealthy diet choices." R. 462–63. An examination found leg swelling and weight gain, but was negative for chest pain or palpitations and found her cardiac rate and rhythm to be regular and pulmonary effort to be normal. R. 463–64. A physician's assistant found plaintiff's cardiac condition to be stable, encouraged physical activity, prescribed Lasix and an echocardiogram, and directed a follow-up

7

appointment in six months.  R. 462–63.

An echocardiogram performed on February 28, 2019, showed, among other things, "normal left ventricular systolic function with a[n] . . . ejection fraction of 57%," "normal right ventricular size and systolic function," "mild pulmonic regurgitation," and that "stage II diastolic dysfunction" revealed by a May 21, 2018 echocardiogram had reverted to normal function.  R. 578–84.

On May 1, 2019, plaintiff visited SCS for a preoperative cardiac clearance before cataract surgery.  R. 444–45.  Plaintiff complained of increasing shortness of breath, burning chest pain upon exertion, right arm heaviness, and edema in her lower extremities.  R. 445.  A physical exam revealed normal cardiac and lung activity, and only trace bilateral, lower extremity edema.  R. 446. An EKG revealed sinus tachycardia with a heart rate of 106 beats per minute.  *Id.*  A physician assistant's assessment identified continuing coronary artery disease, chronic diastolic congestive heart failure that was "stable without acute decompensation," controlled hypertension and LDL, continued plaintiff's existing medications, and ordered a nuclear stress test.  R. 445 (noting also that plaintiff had bought a bike and was starting an exercise regimen).

On May 10, 2019, plaintiff underwent a nuclear stress test or myocardial perfusion study. R. 569–74.  The test revealed "abnormal" results and "medium risk," with a left ventricle ejection fraction of 61%, and a "large sized, severe intensity infarct in the apical wall," relative to a March 6, 2018 abnormal report "showing a moderate dense infarction at distal anterior and apex extending to the inferoapical wall . . . and an [ejection fraction] of 36%."  R. 569.

Apparently due to those results, Dr. Stine performed another cardiac catherization, including a left ventriculogram, on plaintiff on May 21, 2019.  R. 562–64.  This revealed "diffuse 95% [i]n stent restenosis[s]" in the left anterior descending artery, R. 563, and also found "[m]ild

8

plaque ([less than] 50%) is present in the bilateral internal carotid arteries that is not associated with a hemodynamically significant stenosis" and that "antegrade flow with a normal hemodynamic profile was present in both vertebral arteries," R. 560; *see also* R. 563 (noting an ejection fraction of 60%). Dr. Stine assessed plaintiff as having, among other things, unstable angina, coronary artery disease, and in stent restenosis of the lower anterior descending coronary artery. R. 424–27. He again sent her for evaluation for bypass surgery. R. 426.

Plaintiff was scheduled for coronary artery bypass graft surgery on May 29, 2019, but the procedure was canceled. R. 418–19. After review of plaintiff's tests and medical history, on June 7, 2019 Dr. Dimeling again assessed her as a "[v]ery poor surgical candidate despite [her] age and [left ventricle] function." R. 417 (describing as a 50-year old female with "[chronic total occlusion] of [right coronary artery] and . . . of [lower anterior descending coronary artery] now w[ith] in stent restenosis"). He stated that bypass surgery would not benefit plaintiff, noting that "her targets are not appropriate for long term benefit of [bypass surgery] . . . [t]he run off, small vessels, and limited territory are all bad characteristics." *Id.* Dr. Dimeling then sent plaintiff back to Dr. Stine for "medical management." *Id.*

On June 11, 2019, plaintiff reported to SCS for a follow-up examination. R. 406–11. She complained of ongoing chest discomfort and shortness of breath upon exertion. R. 408. Plaintiff denied having palpitations, syncope, orthopnea, edema, paroxysmal nocturnal dyspnea, or nausea/vomiting, and exhibited a regular cardiac rate and rhythm and normal pulmonary effort. R. 408–09. Medical management, plaintiff was advised, included a heart healthy diet, abstinence from alcohol, and following a prescribed cardiac regimen. R. 408. Due to stress occasioned by her prognosis, as well as a recent robbery at the 7-Eleven where she worked, plaintiff stated she planned to stop working and apply for disability. *Id.* The physician's assistant assessed coronary

artery disease with stable angina, chronic diastolic congestive heart failure ("[s]table without acute decompensation"), controlled hypertension, and mixed hyperlipidemia. R. 407–08. She continued plaintiff on aspirin, Plavix, Coreg, lisinopril, Lasix, prescribed Ranexa, and referred plaintiff to the Ornish Lifestyle Medicine program at Sentara Princess Anne Hospital. R. 406–08.

At her next appointment on July 23, 2019, plaintiff reported less chest discomfort after starting on Imdur and Ranexa, but that "some shortness of breath" remained, without other symptoms. R. 739. Plaintiff expressed a desire to begin cardiac rehabilitation. *Id.* A cardiac and pulmonary exam revealed normal results. R. 740.

On July 29, 2019, plaintiff had an intake evaluation for the cardiac rehabilitation/Ornish Lifestyle Medicine program. R. 727. Plaintiff reported: (1) reduced vision in both eyes due to glaucoma and cataracts, but an ability to read/write with corrective lenses; (2) having chest pain and shortness of breath roughly 1 to 5 times per week, aggravated by stress and exertion and mitigated by rest; (3) averaging 6 hours of sleep per night, in spite of sleep apnea, and without use of a CPAP; (4) having no formal exercise program or use of assistive devices or durable medical equipment and demonstrated she could get up and down from the floor; (5) having bilateral carpal tunnel syndrome and rheumatoid arthritis; (6) weekly counseling for anxiety and depression; and (7) wanting to learn to eat better, lose weight, and increase energy levels. R. 728–30. After the evaluation, a physician's assistant prescribed Nitroglycerine for acute, episodic chest pain. R. 727.

On October 24, 2019, Paul M. Lavigne, M.D., a cardiologist with SCS, performed a left heart cardiac catherization, a coronary angiography, and associated procedures on plaintiff. R. 696–99. Before the procedure, plaintiff described recently experiencing non-radiating, "substernal chest 'pressure'" with increasing frequency. R. 692. The angiography revealed: (1) that the left main coronary artery was "short, widely patent"; (2) the left anterior descending coronary artery

contained a stent "with diffuse 95% restenosis"; (3) the left circumflex coronary artery with a "small proximal OM 1 branch with diffuse disease beyond which there is no significant stenosis"; and (4) the right coronary artery was a "very small non dominant vessel." R. 698. The treatment included use of a laser atherectomy catheter to remove blockage, the use of intravascular ultrasound, and the use of balloon catheters and the placement of overlapping drug-eluting stents. R. 699. The treatment resulted in the successful reduction of stenosis from 90% to 0%. *Id.*; *see* R. 797. Dr. Lavigne findings note that within two weeks of the procedure, plaintiff symptoms should fall with "CCS Angina Class: 3" and "NYHA CHF Class: 3."[4] R. 795. On the next day, the hospital discharged plaintiff. R. 796.

On November 20, 2019, a physician's assistant as SCS saw plaintiff for a follow-up examination. R. 782–87. Plaintiff stated she felt much better, with only intermittent, fleeting chest discomfort. R. 783. She also asked whether she could continue going to gym after finishing cardiac rehabilitation. *Id.* A physical examination of plaintiff was unremarkable. R. 783–84.

On March 10, 2020, plaintiff returned to SCS complaining of a relapse into exertional chest discomfort and shortness of breath, with minimal exertion. R. 856. This change became apparent

---

[4] "CCS Angina Class" refers to the Canadian Cardiovascular Society's grading of angina pectoris (grades I–IV) and class 3/grade III corresponds to a "Marked limitation of ordinary physical activity. Walking one or two blocks on the level and climbing one flight of stairs in normal conditions and at a normal pace." *See* https://ccs.ca/app/uploads/2020/12/Ang_Gui_1976.pdf (last visited on March 15, 2022).

"NYHA CHF Class" refers to the New York Heart Association's functional classification (classes I–IV) of symptoms for patients with congestive heart failure and, according to the American Heart Association, class III involves "Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea." *See* https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last visited on March 15, 2022).

over time and during visits to and walks at the library, necessitating stopping and resting to relieve discomfort before moving again. *Id.* Although having no change in peripheral edema or increased discomfort when lying down or at night, plaintiff felt fatigued and described her condition as similar to that before the October 2019 catherization. *Id.*; *see also* R. 723 (noting debilitating symptoms on August 12, 2019). The physician's assistant assessed plaintiff as having "fairly reliable exertional chest discomfort and dyspnea similar to what she had prior to her last intervention," ordered preoperative blood work, and stated that "[g]iven plaintiff's history . . . we will repeat [left heart catherization] with Dr. Paul Lavigne." R. 854 (noting also missed aspirin and Plavix doses once or twice a week and need for compliance).

On March 31, 2020, Dr. Stine completed a medical source statement addressing plaintiff's capacity to engage in work-related activities, mostly by checking boxes on a pre-printed form. R. 830–35 (noting also plaintiff was "last seen on 1/24/20"). Dr. Stine indicated that: (1) plaintiff could occasionally lift and carry items weighing up to 10 pounds, R. 830; (2) plaintiff could sit for up to 1 hour without interruption and up to only 1 hour during an 8-hour workday, R. 831; (3) plaintiff could stand for 10 minutes and walk for 5 minutes, without interruption, *id.*; (4) plaintiff required a cane to ambulate, that such was medical necessary, and that she could use her free hand to carry small objects, *id.*; (5) plaintiff could occasionally reach and engage in manipulative activities with her right hand, but never do so with her left, R. 832; (6) plaintiff could occasionally use both her right and left foot to operate foot controls, *id.*; (7) plaintiff could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, but never climb ladders or scaffolds or crawl, R. 833; (8) plaintiff has visual impairments affecting her ability to read, *id.*; (9) plaintiff could never work at unprotected heights, around moving mechanical parts, where she would be exposed to dusts and other pulmonary irritants, in extreme cold/heat, or around vibrations, R. 834; (10)

12

plaintiff would likely be off task 25% or more in a typical workday and average monthly absences due to impairments would exceed 4 days per month, *id.*; (11) plaintiff could go shopping, walk a block at a reasonable pace over uneven surfaces, use public transportation, climb a few steps at a reasonable pace using a single handrail, prepare simple meals, engage in personal care, and handle and sort paper and files, but not ambulate without an assistive device or travel without a companion or other assistance. R. 835.

Although Dr. Stine signed the form on March 31, 2020, two weeks later he apparently added some brief commentary in the spot on the form's last page for listing medical findings supporting his assessment. R. 835. Following printing that reads "[coronary artery disease] need cardiology input on activity restrictions," Dr. Stine apparently wrote "no lifting + stairs, no strenuous exertion," followed by his signature and the date notation "4/14/20." *Id.*

### 2. *Treatment at Sentara Ambulatory Care Center*

Plaintiff regularly received treatment at the Sentara Ambulatory Care Center ("SACC"), primarily for diabetes mellitus type 2, and other conditions. *See* R. 438 (noting plaintiff's diabetes diagnosis dates back 20 years). Plaintiff treated at SACC during 2018 on July 2, October 1, and November 26. R. 480–84, 488–92, 506–10. During 2019, plaintiff received care on February 4, March 11, June 10, and August 12. R. 412–17, 452–56, 470–74, 723–27.

Treatment notes from February 4, 2019, indicate existing diagnoses of bilateral carpal tunnel syndrome, class 3 severe obesity, coronary artery disease, essential hypertension, and type 2 diabetes with diabetic neuropathy. R. 471. With respect to heart issues, plaintiff reported "doing well, [having] increased energy overall and [no] . . . chest pain." *Id.* Plaintiff complained, however, of worsening hand problems, dropping items, and difficulty bending her fingers and using zippers due to pain. *Id.* A physical exam revealed, among other things, a positive Phalen

13

test and a negative Tinel test. R. 473. The treatment plan included an EMG study, possible referral to a hand surgeon, and referral to a podiatrist. R. 471.

On March 11, 2019, SACC treated plaintiff for back pain and spasms. R. 453. Plaintiff said she was "doing well" and noted she could "walk 4–5 blocks without any chest pain [or shortness of breath, and that she was] able to walk up one flight of stairs, is tired but no chest pain." *Id.*

On June 10, 2019, plaintiff came to the clinic and stated she was depressed about having "a ticking time bomb in her chest" and the lack of a surgical option and complained of left hand pain. R. 412–13. Although "feeling ok" currently and without chest pain, plaintiff stated she had chest pain and felt "unwell most days, . . . very fatigued and not able to do much without . . . [shortness of breath]." R. 413. Examination of the left hand was positive for the Tinel test and decreased range of movement, and the treating physician prescribed home stretching exercises, a brace, and EMG testing, with referrals to a social worker, mental health counseling, and occupational therapy. R. 413, 416; *see* R. 415 (noting decreasing strength in fingers in left hand, which plaintiff reported as "progressing over time").

Plaintiff returned to the clinic on August 12, 2019, complaining of shortness of breath and was assessed as a class 3 heart failure on the classification scale. R. 723 (noting "NYHA 3/4 shortness of breath is debilitating, and she might need repeat cath[eterization] . . . to evaluate burden of [coronary artery disease] and any interventions possible"). Plaintiff was referred for a pulmonary function test and given sample bronchodilators.[5] R. 726–27 (noting "worsening dyspnea, now has to stop every 2 stairs to catch her breath when climbing stairs, endorsed dry cough"). This is the final treatment record from SACC.

---

[5] The record contains no indication whether this pulmonary function testing ever took place.

### 3.    *Treatment at Sentara Internal Medicine Physicians*

The record reflects plaintiff transitioned from SACC to Sentara Internal Medicine Physicians. R. 717–18, 723. On September 30, 2019, physician's assistant ("PA") Jennifer Potts gave plaintiff a comprehensive, initial examination. R. 717. Plaintiff complained of worsening depression and stated a desire to resume medication to help ward off a return to the "darkness" she experienced 10 years earlier. R. 718. PA Potts noted that plaintiff's hypertension, dyslipidemia, and type 2 diabetes were stable on existing medications, and that she needed a CPAP machine for sleep apnea. R. 719. PA Potts also assessed plaintiff as having a severe episode of recurrent major depressive disorder, without psychotic features, and as having bipolar one disorder. R. 717. The physical examination findings were otherwise unremarkable. R. 721. PA Potts referred plaintiff to psychiatry, ordered a sleep consultation, a diabetic eye exam, and a colon cancer screen, and discussed a plan for dental treatment. R. 717–18. She directed that plaintiff return in a week to further assess her depression. R. 718.

On October 11, 2019 plaintiff returned and complained of chest pain, dizziness, light-headedness, and pressure, as if "something heavy [was] sitting on [her] chest." R. 714 (noting similar symptoms the day before that resolved with rest). After ordering an EKG (with negative results), PA Potts called emergency medical services and plaintiff was transported to the hospital.[6] R. 714.

On January 24, 2020, plaintiff saw PA Potts for an office visit, primarily for a blood pressure medication refill. R. 905–10. Plaintiff reported completing her lifestyle medication

---

[6] Although the hospital records are not included in the record, plaintiff was transported to DePaul Hospital and released to follow-up with her treating cardiologist for chest pain. R. 713–14. As described above, Dr. Lavigne of SCS performed a cardiac catheterization on plaintiff on October 24, 2019. R. 713.

program and denied having any chest pain, shortness of beath, or edema.  R. 906.  Physical and mental examinations were unremarkable.  R. 908–09.  PA Potts assessed plaintiff's hypertension, diabetes, diabetic retinopathy, and coronary artery disease as stable on the current medications and reviewed diet and exercise strategies to address obesity.  R. 905.

Plaintiff virtually treated with PA Potts on April 21, 2020, for a recent onset of acute upper back pain and muscle spasm.  R. 895.  PA Potts prescribed Flexeril and referred plaintiff for physical therapy.  R. 895–96.  She noted no changes as to plaintiff's heart condition.  *Id.*

At a follow-up virtual examination on May 19, 2020, plaintiff stated that her back was getter better and she only took the Flexeril one time.  R. 885–86.  Plaintiff denied having chest pain, edema, and shortness of breath, but reported continuing "numbness or burning pain of the feet due to diabetic neuropathy."  R. 886.

On April 14, 2020, PA Potts also completed a medical source statement assessing plaintiff's ability to engage in work-related activities.  R. 837–42.  With one exception, PA Potts' assessed plaintiff's functional abilities the same as Dr. Stine.  *Compare* R. 830–35 *with* R. 837–42.  The only difference exists on the last page of the form and in the listing of medical findings supporting PA Potts' assessment.  R. 842.  After the printed words "[coronary artery disease] – need cardiology input on activity restrictions," PA Potts apparently wrote "no exertion, no activities that will cause chest discomfort (if [patient] has symptoms of chest discomfort th[e]n she is allowed to stop), no heavy lifting or moving."  *Id.*

### 4.   *Treatment at EVMS's Department of Ophthalmology*

Plaintiff also regularly received treatment for proliferative diabetic retinopathy at the Department of Ophthalmology at EVMS, which treatment often included injections into one or both eyes.  In 2018, this treatment took place on June 19, September 25, November 13, and

16

November 27.  R. 477–80, 484–88, 492–95, 527–29.  For example, on June 19, 2018, plaintiff received regular treatment for "stable proliferative diabetic retinopathy of both eyes associated with type 2 diabetes mellitus" from Andrew Davis, M.D.  R. 527–29.  Treatment notes reflect a "[m]acular edema" of the left eye treated with an "[i]ntravitreal injection of Avastin," and a "[m]acular hole of [the] right eye."  R. 527.

In 2019, plaintiff received treatment on January 29, February 12, February 26, April 23, and July 23.  R. 449–51, 457–61, 467–70, 474–76, 733–37.  During a visit on February 12, 2019, the doctor's impressions were for proliferative diabetic retinopathy of both eyes with macular edema associated with type 2 diabetes mellitus, combined forms of age-related cataracts in both eyes, and lamellar macular hole of the right eye.  R. 467.  Plaintiff's vision was listed as 20/200, consistent with her baseline, and she reported no noticeable improvement following a January 29, 2019 injection into her right eye.  *Id.*; *see* R. 475.

Notes from July 23, 2019 indicate that intravitreal injections had been put on hold due to the lack of vision improvement and that plaintiff was at "high risk for adverse cardiac events with cataract surgery due to 95% in stent stenosis of [left anterior descending coronary artery]."  R. 734.

### 5.    *Treatment by Dr. Arteen Rassool*

On February 11, 2020, plaintiff received a diabetic foot exam from Arteen Rassool, D.P.M.  R. 844–45.  Plaintiff complained of foot pain and numbness.  R. 844.  Dr. Rassool's examination found intact sensation, a normal mono-filament test, and normal muscle strength and tone, but reduced temperature and vibratory sensations bilaterally.  R. 844.  Dr. Rassool treated plaintiff for an ingrown toenail and onychomycosis and prescribed Ketoconazole and Gabapentin.  R. 845.

17

### 6. *Consultative Examination*

On December 2, 2019, Scarlett Jett, Psy.D., conducted a consultative psychological examination into plaintiff's depression and anxiety. R. 820–27. Dr. Jett diagnosed "[u]nspecified bipolar and related disorder with psychotic features," "unspecified anxiety disorder with panic attacks," and with other disorders in sustained remission. R. 825–26. Dr. Jett recommended therapy and psychiatric intervention. R. 826. Dr. Jett assessed plaintiff as having no or only mild functional limitations in all pertinent domains of mental functioning, except one. R. 825. With respect to emotional regulation, behavioral control, and maintenance of well-being, Dr. Jett assessed moderate limitations due to the two diagnoses noted above. *Id.*

### 7. *State Agency Physician Reviews*

On August 1, 2019, Wyatt Beazley, III, M.D., a state agency consultant, reviewed plaintiff's medical record. R. 81–85, 92–96. Dr. Beazley assessed that plaintiff: (1) could, with normal breaks, stand and/or walk roughly 6 hours in an 8-hour workday; (2) could sit for the same time period; (3) could lift 20 pounds occasionally, and 10 pounds frequently; (4) could occasionally climb stairs/ramps, stoop, kneel, crouch, and crawl; (5) could frequently balance, but never climb ladders, ropes, or scaffolds; (6) had no manipulative or communicative limitations; (7) had stable diabetic retinopathy, but had limited near and far visual acuity, depth perception, and accommodation in her right eye (20/200); and (8) had environmental limitations that necessitated avoiding concentrated exposure to pulmonary irritants and workplace hazards. R. 81–83 (explaining that a "[l]ight RFC seems appropriate"), 92–94.

At the reconsideration level, on December 10, 2019, William Rutherford, Jr., M.D., reached findings nearly identical to those of Dr. Beazley. R. 109–11, 122–24. Dr. Rutherford added an environmental limitation for plaintiff to avoid concentrated exposure to extreme cold and

heat.  R. 110.  Dr. Rutherford also observed that plaintiff's coronary artery disease was "much improved since laser treatment for in-stent stenosis [in October 2019]."  R. 111; *see also* R. 105–06.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[7] the ALJ followed the five-step analysis set forth in the SSA's regulations.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her RFC; and (5) had an impairment that prevents her from engaging in any substantial gainful employment.  R. 18–31.

The ALJ found that plaintiff met the insured requirements[8] of the Social Security Act through September 30, 2023, and had not engaged in substantial gainful activity from June 1, 2019, her alleged onset date of disability.  R. 19.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) cardiomyopathy; (b) ischemic heart disease; (c) chronic heart failure; (d) diabetes mellitus; (e)

---

[7] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a)  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  *Id.*

[8] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act.  *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

obesity; (f) right eye disorders; and (g) diabetic retinopathy.  R. 19–20.  The ALJ classified

plaintiff's other impairments, including hypertension, hyperlipidemia, sleep apnea, history of

breast cancer, asthma, depression, and anxiety as non-severe.[9]  R. 20–21.  The ALJ further

determined that plaintiff's severe impairments, either singly or in combination (along with her

other conditions), failed to meet or medically equal the severity of one of the impairments listed

in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three.  R. 21–

22.

      The ALJ next found that plaintiff possessed an RFC for light work, *see* 20 C.F.R.

§§ 404.1567(a), 416.967(a), subject to the limitations that she:  (a) "can frequently but not always

balance"; (b) "can occasionally climb stairs, stoop, kneel, or crouch," but "never climb ladders or

crawl"; (c) "can have no more than frequent exposure to extreme cold or extreme heat," and "only

occasional exposure to vibration and . . . to fumes, . . . gases or pulmonary irritants"; (d) "can have

no more than frequent exposure to workplace hazards such as unprotected heights and dangerous

machinery"; (e) "is limited to standing or walking up to four hours in an eight-hour workday"; (f)

"is limited to jobs that do not require bilateral visual acuity due to blindness of the right eye"; (g)

"is limited to only nonproduction paced tasks as to tempo and capacity"; and (h) "can frequently

but not always push or pull with the feet."  R. 23.

      At step four, the ALJ found that plaintiff could not resume working as a cashier or sales

attendant.  R. 29–30.  Finally, at step five, the ALJ found, having considered the VE's testimony

and plaintiff's age, high school education, work experience, and RFC, that plaintiff could perform

other jobs available in the national economy, such as an office helper or linen sorter.  R. 30–31.

---

[9] Due to the lack of objective evidence, the ALJ also found that plaintiff's carpal tunnel syndrome
was not a medically determinable impairment.  R. 21

Accordingly, the ALJ concluded plaintiff was not disabled from June 1, 2019, through August 25, 2020, and was ineligible for a period of disability or DIB or SSI. R. 31.

## IV.     STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence

supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V. **ANALYSIS**

### A. *The ALJ's assessment of Dr. Stine's medical opinions and source statement is not supported by substantial evidence.*

Plaintiff seeks a remand arguing that the ALJ improperly found the medical opinions of her treating cardiologist, Dr. Stine, and primary care provider, PA Potts, unpersuasive. Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 17, at 6–11. Plaintiff argues the ALJ neglected to analyze the supportability of such opinions, by ignoring treatment she received at Sentara Cardiology Specialists (Dr. Stine's practice) and Sentara Internal Medicine Physicians (PA Potts' practice). *Id.* at 9. Further, although acknowledging that the ALJ discussed the factor of consistency, plaintiff argues he gave short shrift to "a plethora of evidence" showing that Dr. Stine and PA Potts' opinions aligned with other evidence. *Id.* at 10; Pl.'s Reply Br. to Def.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27, at 5. Due to such errors, plaintiff contends that the ALJ's decision is unsupported by substantial evidence. Pl.'s Reply 5.

The Commissioner argues that the ALJ properly analyzed Dr. Stine and PA Potts' medical opinions and that substantial evidence supports the RFC finding. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 22, at 24. As Dr. Stine and PA Potts neglected to state a rationale for or cite to pertinent treatment notes, the Commissioner argues that the ALJ correctly treated their opinions as unsupported. Def.'s Mem. 26–27. The Commissioner also rejects the claim that supportability analysis required the ALJ to review plaintiff's treatment record with Dr. Stine and PA Potts' practices. *Id.* at 27 (arguing that plaintiff's call for such analysis "conflates the factor of *supportability* . . . with *consistency*").

The Commissioner also argues that the ALJ properly evaluated the factor of consistency; finding Dr. Stine and PA Potts' opinions wanting, based on other evidence (or its absence) about

plaintiff's cardiac condition, diabetes, vision issues, need for a cane, and functional abilities. *Id.*
at 27–28. Finally, the Commissioner argue that remand is inappropriate because the Court's task
is not to re-weigh the evidence, conflicting or otherwise, but simply to decide if the record contains
"'such evidence as a reasonable mind might accept as adequate to support' the ALJ's conclusion."
*Id.* at 29 (citing *Biestek*, 139 S. Ct. at 1154).

### 1. The SSA's methodology for considering medical opinions for claims filed on or after March 27, 2017, applies to this case.

The SSA revised its medical evidence rules for claims, such as plaintiff's, filed on or after
March 27, 2017.[10]  82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132
(Mar. 27, 2017) (correcting technical errors in final rule).  Under those rules, an ALJ must consider
and explain the persuasiveness of each medical opinion in the record.[11]  20 C.F.R. §§ 404.1520c(b),
416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content
of medical opinions and less on weighing treating relationships against each other").  In doing so,
an ALJ no longer need give controlling (or assign any other) weight to medical opinions.[12]  20
C.F.R. §§ 404.1520c(a), 416.920c(a).

---

[10]  The revised regulations dispensed with the treating physician rule.  See 20 C.F.R.
§§ 404.1527(c)(2), 416.927(c)(2); *see also Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251,
255–56 (4th Cir. 2017).  The SSA also rescinded Social Security Ruling ("SSR") 96-2p, 61 Fed.
Reg. 34490, 34491 (July 2, 1996), discussing how to weigh treating source opinions. 82 Fed. Reg.
15263-01, at 15263 (Mar. 27, 2017) (noting that, for claims filed on or after March 27, 2017,
"adjudicators will not assign a weight, including controlling weight, to any medical opinion"); 82
Fed. Reg. 16869-02 (Apr. 6, 2017) (corrective notice noting recission effective date of March 27,
2017); *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

[11]  A "medical opinion" is a statement from a medical source about a claimant's limitations and
ability to perform physical, mental, and other work demands, and to adapt to a workplace
environment, in spite of her impairments.  20 C.F.R. §§ 404.1513(a)(2)(i)–(iv), 416.913(a)(2)(i).

[12]  Opinions of state agency consultants, identified as "prior administrative medical findings," are
assessed using the same rubric.  20 C.F.R. §§ 404.1520c(a), 416.920c(a); *see* 82 Fed. Reg. 5844,
at 5853 (highlighting the "eliminat[ion of] confusion about a hierarchy of medical sources" and

In assessing persuasiveness, the ALJ's chief task is to decide whether the opinion or finding is supported by and consistent with the record. *Id.* § 404.1520c(b)(2), (c)(1)–(2); § 416.920c(b)(2), (c)(1)–(c)(2); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors"). The ALJ also should consider a medical source's specialization, relationship with the claimant, and other factors tending to support or contradict a particular opinion or finding. *Id.* §§ 404.1520c(c)(3)–(5), 416.920c(c)(3)–(5). But, ALJ explanation about these other factors is only required by the rule when an ALJ concludes that two or more medical opinions are equally supported by and consistent with the record. *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3). Finally, when a source opines on multiple matters, an ALJ need not explain how she considered each such opinion. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). Instead, a single analysis of all of a source's opinions is permitted, if an ALJ articulates how she made use of the factors identified above. *Id.* This framework guides the Court's review below.

### 2.   The ALJ's rationale for finding Dr. Stine and PA Potts' opinions to be not persuasive.

Dr. Stine and PA Potts provided check-the-box medical source statements in early 2020 directed to plaintiff's ability to engage in work-related physical activities. R. 830–42. The statements are substantially identical, except for brief narratives, in which Dr. Stine wrote "no lifting + stairs, no strenuous exertion," R. 835, and PA Potts wrote "no exertion, no activities that will cause chest discomfort (if [patient] has symptoms of chest discomfort th[e]n she is allowed to stop)[,] no heavy lifting or moving," R. 842.

---

greater focus upon the persuasiveness of any given opinion); 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (defining "prior administrative medical finding[s]" as those rendered by federal or state agency consultants).

The ALJ addressed the two opinions separately, but gave mostly the same reasons for finding them not persuasive. R. 26–27. The Court summarizes those reasons only once. The ALJ observed that the "checklist-style forms . . . [specify] only conclusions regarding functional limitations without any rationale." *Id.* The ALJ also concluded that both forms were apparently "completed as an accommodation to the claimant," without providing grounds for that finding. *Id.* The ALJ also attributed "no probative value [to the medical source statements] because [they were] not supported by any objective evidence." *Id.*

The ALJ reviewed some of the objective evidence pertaining to plaintiff's impairments. He found that her cardiac impairments: (1) were managed with treatment; (2) improved with catheterization, and that 2019 and 2020 echocardiogram findings were stable, with ejection fractions of 55 to 60%; and (3) did not result in hospitalizations or "frequent" emergency room visits. *Id.* The ALJ also noted that plaintiff had stable cardiovascular and pulmonary findings. *Id.*

The ALJ found that plaintiff's diabetes, and any associated neuropathy, was managed with medication, as evidenced by home glucose readings in the 100s, the absence of hypoglycemic symptoms, her intact strength, and relatively intact neurological findings. *Id.* As for her diabetic retinopathy and visual limitations, the ALJ found plaintiff to be blind in the right eye. *Id.* at 27–28.

Finally, the ALJ found no evidence of: (1) upper extremity limitations, aside from some notes reflecting occasional left-hand weakness; (2) symptoms causing plaintiff to be off task 25% of a workday and absent from work more than four days per month; or (3) falls by the plaintiff or the regular use of a cane. R. 26–28. The ALJ concluded that both Dr. Stine and PA Potts' opinions were inconsistent with the evidence and not persuasive. *Id.* at 27–28.

3.    **The ALJ erred in analyzing Dr. Stine's opinions and the resulting RFC finding is not supported by substantial evidence.**

The ALJ's treatment of Dr. Stine's medical opinions is not supported by substantial evidence. Contrary to plaintiff's assertion, the ALJ actually considered the factor of supportability, but cursorily focused upon items of limited significance to plaintiff's overall cardiac condition. The ALJ mostly neglected to review the extensive objective medical evidence in Dr. Stine's treating records. The ALJ also failed to address other objective medical evidence consistent with and of consequence to assessing Dr. Stine's opinions. Due to the arguable impact of plaintiff's cardiac impairments upon any RFC finding, remand is appropriate.

The persuasiveness of any medical opinion is closely connected to the presence of supporting objective medical evidence, as well any supporting explanation from a healthcare provider. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). Consideration of each aspect is necessary when assessing supportability. *Id.* Here, it is undisputed that Dr. Stine offered no meaningful explanation for his opinions in the medical source statement. Although this omission tends to reduce the persuasiveness of his opinions, it does not end the analysis, as suggested by the Commissioner. Def.'s Mem. 27 (noting the absence of explanation and proceeding to examine the record for consistency, rather than supportability). As plaintiff correctly argues, assessing supportability also requires examination of objective medical evidence in the treatment records of Dr. Stine's medical practice. Pl.'s Reply 4.

In assigning "no probative value" whatsoever to Dr. Stine's opinions due to the lack of supporting objective evidence, R. 26, the ALJ overlooked substantial evidence in the records of Dr. Stine's cardiology practice. This omission arguably caused the ALJ to lose sight of the forest for the trees and to deem plaintiff's cardiac conditions as "managed with treatment" based mostly upon the results of cardiac catheterizations, stable echocardiogram findings in 2019 and 2020 with

ejection fractions ranging from 55 to 60%, and the lack of "frequent" visits to the emergency room. R. 26; *cf. Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)) (noting the absence of a "rigid requirement" to discuss every piece of evidence, but holding that the failure to discuss substantial parts of the record bearing on the issue at hand "warrants some explanation").

Dr. Stine, and those working in his practice, have treated plaintiff for serious health problems, including coronary artery disease and congestive heart failure, on roughly a dozen occasions dating back at least to April 2018. R. 522. Based on the results of cardiac catheterizations in April 2018 and again in May 2019, Dr. Stine identified plaintiff as in need of open heart, bypass surgery. R. 426. Yet, both times the consulting surgical expert declined to operate due to plaintiff's poor health, including diabetes, and other factors making her a poor surgical candidate. R. 417–19, 426.

This left plaintiff with the fallback option of "medical management." R. 417. Since April 2018, plaintiff underwent four cardiac catheterizations on April 19, 2018, June 21, 2018, May 21, 2019, and October 24, 2019.[13] R. 522–23, 562–64, 696–99. These procedures were undertaken to assess plaintiff's heart function due to problems identified via testing and examinations, and/or to remedy vessel blockages, chest pain, and shortness of breath.

As correctly noted by the ALJ, the June 2018 and October 2019 catheterizations led to some improvement in plaintiff's condition. R. 495–96, 522–23, 699, 783, 797. But the treatment history and testing show the beneficial effects were short-lived and followed by rapid deterioration. Less than a year after the June 2018 stent placement, plaintiff's shortness of breath and chest pain upon exertion returned, and nuclear stress testing revealed "abnormal" results, including a large-

---

[13] Dr. Stine performed the first three procedures and his partner, Dr. Lavigne, the fourth.

sized, severe intensity, zone of dead heart tissue in the apical wall. R. 569 (noting deterioration from March 6, 2018 stress test). This deterioration also was evidenced in the May 2019 catherization performed by Dr. Stine, showing 95% in stent restenosis or vessel blockage. R. 563.

This led to Dr. Lavigne's October 2019 catheterization, which removed the blockage and installed new stents, resulting in some improvement. R. 696–99, 783, 797. But, five months later, the prior pattern re-emerged when plaintiff presented at SCS with chest discomfort and shortness of breath and was assessed to be in need of another left heart catheterization.[14] R. 854. Though noting plaintiff's symptoms, the ALJ focused upon her "normal pulmonary and cardiovascular functioning" in a physical exam and stated, "she was continued on medication," without discussing the provider's referral for another catheterization and preoperative blood work. R. 25, 856–57. Also, even if residual benefits remained from the October 2019 procedure, Dr. Lavigne's post-procedure findings classified plaintiff as having marked limitations in ordinary physical activity, a fact also not considered by the ALJ. *See* R. 795 (identifying plaintiff as angina class 3 and congestive heart failure class 3).

Such information is at odds with the ALJ's conclusion that no objective medical evidence supports Dr. Stine's opinions and suggests that the ALJ's review of the treatment records was incomplete. *Cf. Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 98 (4th Cir. 2020) (noting that the facts cannot be cherrypicked to support a finding of nondisability). It also indicates that the ALJ erred in refusing to assign any probative value to Dr. Stine's opinions on plaintiff's functional abilities.

---

[14] The record contains no information about the performance of any such procedure, or whether the pandemic caused it to be delayed. Although her testimony is not a model of clarity, plaintiff appeared to advise the ALJ she needed another procedure to treat an arterial blockage, but was told that it could not be done due to the poor condition of her heart. R. 50–51.

Nor were such problems cured by the ALJ's limited review of objective medical evidence focusing on plaintiff's post-catheterization improvement, ejection fractions, stable cardiovascular and pulmonary function, and infrequent trips to the emergency room. R. 26. Having addressed catheterizations above, the Court notes the following about the remaining items. First, to the extent the ALJ relied on stable echocardiogram *findings* noted in 2019 and 2020 examinations, R. 22, 26, the record reveals only a *single* echocardiogram in that time frame on February 28, 2019.[15] R. 578–81; *see* R. 24 (noting May 2019 echocardiogram).

Second, the ALJ's reliance on plaintiff's positive ejection fractions is belied by the information noted above. In spite of plaintiff's ejection fractions, a highly trained cardiologist twice identified plaintiff as needing bypass surgery to treat coronary artery disease and congestive heart failure. R. 417, 426. Also, while exhibiting stable ejection fractions, plaintiff underwent multiple catheterizations to treat blockages and associated chest pain and shortness of breath. *See, e.g.,* R. 562–63 (noting 95% blockage of stent, along with an ejection fraction of 60%). Though plaintiff's heart exhibited adequate function in one respect, other significant problems apparently remained that the ALJ failed to address.

Third, the same logic applies to the ALJ's reference to plaintiff's unremarkable cardiovascular and pulmonary function findings during physical exams. For example, on October 11, 2019, when plaintiff visited with PA Potts complaining of chest pain and an ambulance was called, a physical exam revealed normal cardiovascular and pulmonary findings. R. 714–15. Less than two weeks later, plaintiff needed a catherization to treat the blockage in a heart blood vessel.

---

[15] It appears that the results from this echocardiogram were regularly repeated in plaintiff's treatment records. *See, e.g.,* R. 422–24, 581–84. Prior echocardiograms were performed in August 2017 and May 2018. R. 445. During the catheterization on May 21, 2019, Dr. Stine also performed a left ventriculogram, which measured plaintiff's ejection fraction at 60%. R. 562–64.

R. 696–99.  In the judgment of trained specialists, the presence of such findings failed to obviate the need for multiple, invasive procedures to investigate and address plaintiff's serious heart dysfunction.

Finally, plaintiff regularly visited Sentara Cardiology Specialists from 2018 to 2020, and was hospitalized during multiple catheterizations.  Absent explanation by the ALJ, it is not apparent why the ALJ found this robust treatment record less significant than the fact that plaintiff made few visits to the emergency room in the same time period.

Turning to consistency, the ALJ nowhere discusses the findings of the cardiothoracic surgeon who twice evaluated plaintiff's suitability for open heart surgery and reported back to Dr. Stine.  After evaluation, Dr. Dimeling first rejected plaintiff for such surgery in April 2018, describing her as "a brittle diabetic with age much older than stated" and recommending exploration of other treatment options.  R. 426.  After such options were tried and problems soon returned, plaintiff was scheduled for bypass surgery on May 29, 2019, but Dr. Dimeling again refused to go forward.  R. 418–19.  On June 7, 2019, Dr. Dimeling found plaintiff to be a "[v]ery poor surgical candidate," in spite of her age and ejection fractions.[16]  R. 417 (describing his findings).  Similarly, two months later, Dr. Raghav Gattani at SACC also classified plaintiff's heart failure at grade 3, noting debilitating shortness of breath and possible need for another catheterization.  R. 723.

These findings appear to be consistent with Dr. Stine's opinions of plaintiff's functional abilities, as well as support significant limitations in physical activity.  At a minimum, and in the absence of other, more probative evidence and/or a comprehensive, physical consultative

---

[16] The ALJ's decision states only that "coronary artery bypass grafting was not recommended," without elaboration of the circumstances or context. R. 24.

30

examination, the ALJ needed to discuss and articulate why such evidence had no impact on plaintiff's RFC.

In discussing the factor of consistency, the ALJ also identified a lack of evidence regarding alleged time off task, anticipated monthly absences (more than 4 days), falls by the plaintiff, and her use of a cane. R. 27. Though such matters may appropriately be considered in assessing consistency, a more complete assessment of one of plaintiff's most pressing health issues—her cardiac problems and treatment history—was needed to evaluate the persuasiveness of Dr. Stine's opinions, as well as to fix plaintiff's RFC. That did not occur here. Notwithstanding the shortcomings in the check-the-box form completed by Dr. Stine, the evidence relied upon by the ALJ is inadequate to conclude that Dr. Stine's opinions are not persuasive and that plaintiff retains an RFC for certain light work, involving, among other things, standing or walking up to four hours in a normal workday, five days a week. *See* R. 23, 30–31.

### 4.    The Court need not address the persuasiveness of PA Potts' opinions.

The errors described above relating to Dr. Stine's opinions arguably apply to PA Potts' nearly identical opinions, with two important caveats. First, plaintiff's treatment history with PA Potts' is much shorter than with Dr. Stine and his practice. Plaintiff began treating with PA Potts in September 2019, and received in-person treatment on just three occasions, one of which led to a trip to the emergency room. *See* R. 714, 717–18, 905–10; *see also* R. 885–86, 895–96 (noting two, pandemic virtual appointments). Although not discussed by the ALJ, Dr. Stine and his practice's lengthy and involved treatment relationship with the plaintiff is a factor bearing upon the persuasiveness of a medical opinion. *See* 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3); *see also id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (noting an ALJ need not explain consideration of factors other than supportability and consistency).

Second, with due respect to PA Potts' credentials, she is not a cardiologist. Dr. Stine, on the other hand, is uniquely and highly trained to treat and opine about plaintiff's heart condition and its impact upon her. Although not discussed by the ALJ, such specialization is another factor the rules identify as bearing upon the persuasiveness of medical opinion evidence. *Id.* §§ 404.1520c(c)(4), 416.920c(c)(4).

Remand is appropriate based on the ALJ's treatment of Dr. Stine's opinions alone. Because of this, the Court need not address whether substantial evidence supports the ALJ's treatment of PA Potts' opinions, in view of the differences noted above.

**B.      *No need exists to address plaintiff's argument about the status of the ALJ and the Appeals Council panel ruling upon her claim.***

Plaintiff also seeks remand of her case arguing that the ALJ's denial of her claim and the Appeal Council's denial of review were constitutionally defective because the deciding authorities exercised powers stemming from a statutory structure violative of the separation of powers. Pl.'s Mem. 11–14. The remand recommended above obviates the need to address this second argument. *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (noting that a court should not "pass upon a constitutional question . . . if there is also present some other ground upon which the case may be disposed of").

## VI.      <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 16) be **GRANTED**, the Commissioner's motion for summary judgment (ECF No. 21) be **DENIED**, and the case be **REMANDED** to the Commissioner for further proceedings.

## VII.      <u>REVIEW PROCEDURE</u>

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

32

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
March 16, 2022

33